456 S.E.2d 488

**Amanda Joe GODFREY, an infant, by Martha Widmayer, her next friend, Plaintiff Below, Appellant,**

v.

**Glenn Earl GODFREY and Kim Fazemeyer, Defendants Below, Appellees.**

**No. 22160.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 24, 1995.

Decided March 24, 1995.

David R. Janes, Tharp, Liotta & Janes, Fairmont, for appellant.

Dwight R. Hall, Wallace, Harris & Sims, Elkins, for appellees.

PER CURIAM:

This case arises out of certain serious personal injuries sustained by Amanda Joe Godfrey. Following a two day trial, the jury found the Appellees, Glenn Godfrey and Kim Fazemeyer,[1] negligent and awarded Amanda $30,000. Amanda's mother, the Appellant Martha Widmayer, appeals from the denial of her motion for a new trial on September 13, 1993, by the Circuit Court of Upshur County. We agree with the Appellant that the verdict was manifestly inadequate. Accordingly, we reverse the circuit court's order and remand this case for a new trial on damages.

---

1. In addition to Mr. Godfrey and Ms. Fazemeyer, Amanda also sued Southern States Buckhannon Cooperative, Inc., and Murray Ohio Manufacturing Company. The jury exonerated the latter two defendants, however, and that finding is not challenged on appeal.

## I.

On April 14, 1990, Mr. Godfrey, Amanda's father, entrusted his lawnmower to Ms. Fazemeyer, Amanda's step sister-in-law. Amanda was seven years old at the time. While Ms. Fazemeyer was operating the mower, Amanda was standing on its trailer hitch with her hands resting on Ms. Fazemeyer's shoulders. Amanda stepped off of the mower when she thought that the mowing was finished. The mower, however, began moving backward, and the hitch hit Amanda in the left leg and knocked her down. While the mower was still running, and the blades apparently engaged, Amanda's left foot became caught in the blades and a portion of her foot was degloved.[2] The mower apparently stayed on Amanda's foot for a period of time until her brother lifted it off. Amanda was immediately rushed to St. Joseph's Hospital in Buckhannon. Given the severity of her injuries though, she was moved to the Level One Trauma Center at Ruby Memorial Hospital in Morgantown.

Not surprisingly, Dr. Kurth, Amanda's treating physician at Ruby Memorial, testified that Amanda was in pain upon her arrival at the hospital. He stated that when he removed the dressing around her injury he observed that her foot was "mangled" and "chopped up." He performed surgery on Amanda's foot shortly thereafter and observed in an operation summary that "the wound was grossly contaminated with ground-in dirt and grass clippings." During surgery, he cut away the dead tissue and amputated what was left of Amanda's large toe. Additionally, the record indicates that a flap of skin was removed from the dorsal surface of Amanda's foot, defatted and prepared as a skin graft source. Dr. Kurth also noted that certain bones in the foot were broken and that he set these and "drilled a wire across the fractures to hold them in place."

On April 17, 1990, Amanda underwent further surgery. During the procedure, Dr. Kurth noted the absence of any blood flow to Amanda's second and third toes. Conse-

quently, they too were amputated. Further skin grafts were performed as well, using the defatted flap of skin as well as derma from Amanda's thigh. The graft healed over, and Amanda was sent home on crutches. She spent a total of six days in the hospital.

Amanda returned to the hospital periodically over the next few months for further examinations. Some of these visits are notable. For instance, Dr. Kurth testified that on approximately May 9, 1990, he observed that only seventy-five percent of the skin graft had "taken." Twenty-five percent of the skin had died. On May 22, 1990, Amanda returned to the hospital for further surgery to remove pins from her foot. At that time, Dr. Kurth again noted the presence of a portion of black gangrenous dead tissue around the foot.

Amanda returned to the hospital on April 8, 1991. Dr. Kurth noted that she had some ulceration on the top of her foot which was treated by the use of a chemically-aided burning process. He testified as follows concerning the likely perpetual nature of the ulceration problem:

Q. Do you anticipate that there will be any continued or persistent problems with that type of thing, the irritation or the ulceration that you saw in April of 1991?

A. Yes. I think she can have intermittent problems. I don't think it will be a daily problem. A different pair of shoes, something she can rub on. You have to understand a skin graft is not normal sensate feeling skin and it's not normal thickness. It does do a good job. It allows us to keep a foot or an arm or a leg but it's in no way normal. So we can have areas that get irritated from rubbing and so forth. But it should—that should not be a daily occurrence.

As one might guess, Amanda testified that she was in pain during the incident and that she experienced a continuing level of pain even up to the time of her testimony. She stated that her foot "splits open sometimes" and that her foot "hurts bad" when the

---

2. Dr. Lloyd A. Kurth was the physician who treated Amanda at Ruby Memorial Hospital. His video deposition was introduced into evidence at

trial, and he stated that "degloving" "means that everything's been cut off. All the skin and soft tissues are cut off of an area."

weather is cold or when she hits it on something. She further stated that there are times when she can feel her three missing toes, even though they are now gone.

Amanda also conveyed how the accident has changed her life. For instance, she stated that she sometimes falls "up and down" stairs. Further, unlike her friends, she is required to wear tennis shoes when she dresses up rather than dress shoes. She said that this upsets her and makes her wonder about what will happen in the future regarding proms, her wedding, and employment. She also testified that she has had to endure a persistent course of meanspirited teasing by some of her classmates because of her impairment, one such incident even occurring on her birthday.

As a result of the accident, the Appellant filed a six-count complaint on April 30, 1991. At trial, which commenced on June 22, 1993, the parties stipulated to Amanda's medical expenses. Those expenses totalled $17,-874.39. Following a two day trial, the jury returned its verdict. The jury found Mr. Godfrey 40% negligent and Ms. Fazemeyer 60% negligent and awarded Amanda $30,000 in damages. The Appellant moved for a new trial on July 1, 1993, alleging that the amount of the verdict was inadequate. The circuit court denied the motion on September 13, 1993, via a one-page order.

We agree with the Appellant that the verdict in this case was inadequate as a matter of law. Accordingly, we now reverse.

## II.

■ We have stated that "[i]n an appeal from an allegedly inadequate damage award, the evidence concerning damages is to be viewed most strongly in favor of the defendant." Syl. Pt. 1, *Kaiser v. Hensley*, 173 W.Va. 548, 318 S.E.2d 598 (1983). We have also stated that "[w]e will not find a jury verdict to be inadequate unless it is a sum so low that under the facts of the case reasonable men cannot differ about its inadequacy." Syl. Pt. 2, *Fullmer v. Swift Energy Co., Inc.*, 185 W.Va. 45, 404 S.E.2d 534 (1991). Nevertheless, it is equally well-settled that

'[w]here a verdict does not include elements of damage which are specifically proved in uncontroverted amounts and a *substantial amount* as compensation for injuries and the consequent pain and suffering, the verdict is inadequate and will be set aside. *Hall v. Groves*, 151 W.Va. 449, 153 S.E.2d 165 (1967).' *King v. Bittinger*, 160 W.Va. 129[, 136], 231 S.E.2d 239, 243 (1976).

Syl. Pt. 3, *Kaiser v. Hensley*, 173 W.Va. 548, 318 S.E.2d 598 (1983) (emphasis added).

■ The parties' briefs are almost exclusively devoted to the question of whether the $30,000 award even covers Amanda's future medical expenses. As stated above, the parties stipulated to the medical expenses as of the date of trial in the amount of $17,874.39. There was also testimony, however, concerning the future costs and necessity of orthotic fillers for Amanda's shoes, which were not included in the stipulated amount.

The orthotics are basically a shoe insert fashioned from a plaster impression of the foot that prevents or accommodates defects in the foot. Dr. Leonard Simmons, Amanda's podiatrist, testified that she would require the orthotics for the rest of her life. He stated that the orthotics would need to be replaced yearly during the growing years and approximately every two years thereafter. The cost of each orthotic is approximately $500. Given the parties' apparent stipulation that Amanda's lifespan would extend for an additional 68 years, the lifetime cost of the orthotics was pegged at approximately $17,000. The Appellant thus asserts that Amanda's present and future medical expenses exceeded $34,000 and, therefore, the $30,000 award was clearly inadequate to cover future medical expenses, much less pain and suffering.

The Appellees, however, point to the testimony of Dr. Kurth that Amanda may not even need an orthotic. Even if she did need the device though, Dr. Kurth surmised that "[y]ou could put cardboard or cotton or you can go to the shoemaker and he can make it out of synthetic materials. It's nothing of any real special design or anything. It's just to fill in that space where the toe would have been."

When comparing the technical detail of the doctors' testimonies and their relevant specialties, we question whether the filler is merely for "cosmetic reasons"[3] as suggested by Dr. Kurth. Rather, Dr. Simmons' explanation seems more plausible:

After examining Amanda and seeing the condition of her foot, we felt that we needed to make her an orthotic which would have a prosthetic forefoot, to make up for the loss of bone structure, so that she could, at a minimum, wear shoes that matched, and would not be subject to ridicule. We felt that the orthotic would give her some breaking [sic] action, which the great toe and the second toe were no longer providing for her, could help redistribute weight. The lack of the weight-bearing potential of the first and second metatarsals throws an unusual amount of weight-bearing on the remaining bones, which aren't built to absorb or accept that amount of pressure, and we felt long-term, that this needed to be done to prevent problems from occurring.

We are not certain why the jury did not make an allowance for the orthotics. Such may have been the result of confusion or even a reasoned decision to disregard Dr. Simmons' testimony. Nevertheless, we need not speculate. Even assuming that the jury chose the latter course, its award for pain and suffering was an unreasonable pittance. When one deducts the amount of stipulated medical expenses from the award, the jury awarded just slightly over $12,000 for what can only be described as a permanent physical deformity which caused excruciating pain initially. Further, Amanda's suffering continues, albeit to a lesser degree, even to this day.

One need only cursorily survey the record in this case to ascertain the enormous scale of the pain and suffering endured by then seven-year-old Amanda. In sum, the events immediately surrounding the time of the injury speak volumes about what Amanda tolerated: (1) her foot came into contact with a near razor-sharp blade traveling at thousands of revolutions per minute; (2) the lawn mower stayed on her foot for an undetermined period of time thereafter; (3) the blade wholesally removed all of the skin and soft tissues from a portion of her foot; and (4) the blade reduced the foot to, in the words of a seasoned orthopedic surgeon, a "mangled" and "chopped up" mass of flesh. One must also consider the added specter of the multiple amputations, three operations, the sight of black gangrenous tissue, and the continuing pain that Amanda suffers from (1) cold weather, (2) accidentally hitting her foot and (3) the intermittent splitting of her flesh. Finally, one cannot ignore the teasing and humiliation that Amanda has endured and continues to endure from her peers. As stated by Dr. Simmons, "this type of abuse can be as painful as the physical problem...." In short, this deformity is something that Amanda will live and suffer with, physically and mentally, for the rest of her life.

Even viewing the evidence of damages most strongly in favor of the Appellees, we have no difficulty concluding that, based upon the relevant portions of the record, the amount awarded by the jury was wholly unreasonable, inadequate and unsupported by the evidence. In our view, the jury unjustifiably refused to make the required award of a substantial amount of compensation for Amanda's injuries and her consequent pain and suffering. Accordingly, we hereby set aside the verdict.

■ Having found the verdict manifestly inadequate, we must now determine the appropriate course for the circuit court to pursue on remand. *See Linville v. Moss*, 189 W.Va. 570, 574, 433 S.E.2d 281, 285 (1993). In syllabus point three of *Biddle v. Haddix*, 154 W.Va. 748, 179 S.E.2d 215 (1971), we stated as follows:

In a civil action for recovery of damages for personal injuries in which the jury returns a verdict for the plaintiff which is manifestly inadequate in amount and which, in that respect, is not supported by the evidence, a new trial may be granted to the plaintiff on the issue of damages on

---

3. Even if one accepts that the orthotics would be of cosmetic assistance only, certainly this child who was without fault in this accident, is entitled to any such assistance.

the ground of the inadequacy of the amount of the verdict.

*Id.*

We are also mindful of typology four from our decision in *Freshwater v. Booth,* 160 W.Va. 156, 233 S.E.2d 312 (1977). A type four case is one in which:

> the issue of liability has been so conclusively proven that an appellate court may infer that the jury's confusion was with regard to the measure of damages and not to liability. In this type of case an appellate court can feel justified in remanding the case for a new trial on the issue of damages alone because it would be unfair to put the plaintiff to the expense and aggravation of proving liability once again when he has been denied a proper and just verdict by the caprice and incompetence of a particular jury.

*Id.* at 164, 233 S.E.2d at 317.

 While we have considered the Appellees' arguments to the contrary, we are convinced that this is a type four case.[4] We are satisfied that liability was conclusively proven. Indeed, it would have been exceedingly difficult to prove that Amanda shared any of the blame for the accident, given that she was only seven years old at the time.[5] The jury attributed 100% of the fault to the Appellees for good reason, and we see no need for a new jury to revisit the issue. We are satisfied that the only effect of ordering a new trial on both liability and damages would be to unnecessarily put the Appellant to the additional burden of proving again an issue that she unquestionably prevailed upon already.

---

4. While not relevant to the instant case, we have recognized that *Freshwater* typologies two and three have substantially less viability following the advent of our adoption of the doctrine of comparative negligence. *See, e.g., In re: State of West Virginia Pub. Bldg. Asbestos Litig.,* 193 W.Va. 119, 131, 454 S.E.2d 413, 425 n. 1 (1994) (citing *Linville v. Moss,* 189 W.Va. 570, 433 S.E.2d 281 (1993)).

5. We recently stated in *Pino v. Szuch,* 185 W.Va. 476, 478, 408 S.E.2d 55, 57 (1991), that "West Virginia, like most jurisdictions, treats children with considerable favoritism in regard to their negligent acts." We also stated as follows:

Based upon the foregoing, the order of the Circuit Court of Upshur County denying the Appellant's motion for a new trial is reversed, and this case is remanded for a new trial on the sole issue of damages.

Reversed and remanded.

BROTHERTON, J., did not participate.

FOX, J., sitting by temporary assignment.

> For children between the ages of seven and fourteen, the conclusive presumption [that a child is incapable of negligence] disappears, and a rebuttable presumption applies. However, the burden is upon the party attempting to overcome the presumption to prove that the child has the capacity to be contributorily negligent.

*Id.* at 477–78, 408 S.E.2d at 56–57, syl. pt. 2.

We noted in *Pino* that the rebuttable presumption is "strong" when the child is still in the near vicinity of his or her seventh birthday. *Id.* at 480, 408 S.E.2d at 59.